### STATE OF CONNECTICUT *v.* PEDRO CRUZ
### (AC 20786)

Dranginis, Bishop and Hennessy, Js.

Argued March 28—officially released July 23, 2002

*Jon L. Schoenhorn,* for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, *George Ferko,* senior assistant state's attorney, and *Richard Morelli,* supervisory assistant state's attorney, for the appellee (state).

### Opinion

BISHOP, J. The defendant, Pedro Cruz, appeals from the judgment of conviction, rendered after a jury trial, of assault of a peace officer in violation of General Statutes (Rev. to 1997) § 53a-167c.[1] The defendant claims that the court improperly (1) restricted his cross-examination of the state's key witness, (2) refused to grant his motion for a mistrial on the ground of prosecutorial misconduct during closing argument, (3) precluded him from making a "missing witness" argument, (4) instructed the jury on an essential element of the offense and (5) refused to instruct the jury on the duty to retreat. We affirm the judgment of the trial court.

---

[1] General Statutes (Rev. to 1997) § 53a-167c provides in relevant part: "(a) A person is guilty of assault of a peace officer . . . when, with intent to prevent a reasonably identifiable peace officer . . . from performing his duty, and while such peace officer . . . is acting in the performance of his duties, (1) he causes physical injury to such peace officer . . . or (2) he throws or hurls, or causes to be thrown or hurled, any rock, bottle, can or other article, object or missile of any kind capable of causing physical harm, damage or injury, at such peace officer . . . or (3) he uses or causes to be used any mace, tear gas or any like or similar deleterious agent against such peace officer . . . or (4) he throws, hurls, or causes to be thrown or hurled, any paint, dye or other like or similar staining, discoloring or coloring agent or any type of offensive or noxious liquid, agent or substance at such peace officer . . . ."

The jury reasonably could have found the following facts. On February 7, 1998, at approximately 10:30 p.m., two uniformed officers from the Hartford police department, Carlos Ocasio and Felix Ortiz, were dispatched to an apartment building at 140 New Britain Avenue to investigate a reported domestic disturbance. Upon their arrival, a man at the front door let the officers inside and directed them to the second floor. The officers proceeded up the stairs and encountered Glorimel Rosa on the second floor landing. Rosa later was identified as the defendant's live-in girlfriend and the mother of his infant son. Rosa was crying and hysterical, and her face was red. When the officers attempted to calm her, she blurted out, "He's going to kill me." She also mentioned her baby and referred to a "father," which the officers took to mean Rosa's father. When the officers asked her if anyone was in the apartment, she responded, "Yeah. Don't go in there. He's crazy." She then fled down the stairs.

The officers proceeded to the apartment, walked through the open door without knocking and announced: "Police, is anybody home?" The apartment was dark, except for a lighted room in the rear that appeared to be a kitchen. The officers initially did not see anyone, but as they continued to call out, the silhouette of a man, later identified as the defendant, hastily approached them from the lighted room.

The defendant appeared aggravated and unleashed a tirade laced with obscenities demanding to know who had summoned the officers and why they were there. The defendant accused the officers of illegally entering the apartment, insisted that they needed a search warrant and told them to get out. As the defendant spoke, he was "chest to chest" with Ocasio. The officers asked the defendant to step back, as he was blocking their way to the kitchen, where Ortiz believed they might find Rosa's father. As Ortiz attempted to go around him,

the defendant hit Ocasio in the face with his fist. Ortiz responded by striking the defendant with his nightstick, and the defendant stumbled back. A brawl ensued, in which the defendant swung at the officers with his arms and the officers struck the defendant on his arms, legs and head more than fifty times with their nightsticks and sprayed him with pepper spray.

During the fight, Jeffrey Pianka, the building manager, entered the apartment. Pianka repeatedly told the officers to cease hitting the defendant and, according to Ortiz, attempted to pull Ortiz away. Ocasio chased Pianka from the apartment and radioed for assistance. A short time later, Officer Chris Manning arrived. After Manning helped subdue and handcuff the defendant, he pursued and arrested Pianka.

Several other officers, including Dennis O'Connor, also responded to the call for assistance. When O'Connor arrived, he radioed for an ambulance. Emergency medical personnel found the defendant handcuffed with severe bleeding from his face and neck. The defendant and Ortiz both were taken to Hartford Hospital. Ortiz was treated for a bruised and bloody nose and released that night. The defendant was treated for a broken left forearm, severe lacerations to his head and face, bruises and abrasions to his face, arms, legs and torso, and exposure to pepper spray. Thereafter, Ocasio and Manning discussed the incident and prepared a report. They then spoke with Ortiz, who signed the report.

The defendant was arrested and charged in a three count information with assault in the third degree as to Rosa in violation of General Statutes § 53a-61 (count one), assault of a peace officer in violation of § 53a-167c (count two) and interfering with an officer in violation of General Statutes § 53a-167a (count three). The jury acquitted the defendant of counts one and three, but convicted him of count two. The court denied the

defendant's subsequent motion for a new trial and sentenced him to five years imprisonment, execution suspended, and three years probation. This appeal followed.

I

The defendant first claims that the court improperly restricted defense counsel's cross-examination of the state's key witness in violation of his constitutional right to confrontation. We disagree.

At trial, counsel for the defense attempted to show that the officers had acted outside the scope of their duties by using excessive force on the defendant. Both Ocasio and Ortiz admitted to striking the defendant on his head with their nightsticks, but Ortiz testified on cross-examination that in his official report, he had described the defendant's injuries as bruising, redness and minor lacerations. When counsel specifically asked if Ortiz had noticed "a hole in [the defendant's] lip where his teeth went all the way through," Ortiz replied in the negative.

Thereafter, the defendant's medical records were admitted into evidence without objection. Defense counsel showed Ortiz a series of photographs marked for identification depicting numerous injuries to the defendant. Ortiz testified, however, that he did not recognize the injuries. When the state objected to counsel's graphic description of the injuries shown in one of the photographs, the court advised: "I think what you're going to have to do, counsel, is just ask him if he recognizes the photograph and if it's a fair and accurate representation of the way [the defendant] looked. . . . If he doesn't know, that's as far as we go with it." Counsel replied, "Okay. That's fine."

Defense counsel continued to show Ortiz photographs of the defendant's injuries. Each time Ortiz was

shown a photograph, he responded that he did not recognize the injuries. At one point, the state objected and asked whether counsel had a good faith basis to believe that Ortiz could authenticate the photograph shown. The court instructed Ortiz that "if . . . any of this looks like the way [the defendant] looked . . . then you can indicate yes accordingly, and then we can proceed from there." Ortiz was shown several additional photographs and he testified that he was not able to verify any as a fair and accurate representation of the defendant's condition following the incident.

Defense counsel later began a question to Ortiz by quoting from the defendant's medical records: "Patient found in doorway handcuffed with severe hemorrhaging on face and neck . . . ." The state objected, and the court asked why counsel was using the medical report, which had not been produced by Ortiz, as a basis for the question. Defense counsel responded that he wanted to see if the report refreshed the officer's recollection: "I have a record by medical personnel that contradicts his testimony, and I want to see if he wants to correct his testimony." The state objected, and the court declared: "[I]t's been admitted. I'm not going to allow you to use somebody else's record for purposes of questioning this witness because he has his own statement. I've admitted that evidence, and you're going to have it before the jury. You can argue that to the jury."

Outside the presence of the jury, defense counsel asserted that he should be allowed to confront Ortiz directly with the contradictory evidence of other witnesses. He conceded, however, that the notes in the medical reports did not constitute an inconsistent statement by Ortiz and that Ortiz had never indicated a need to refresh his recollection. The court ruled that defense counsel could not elicit "comparative testimony in the presence of the jury" because a comparison of Ortiz's observations and those of the medical personnel was

a matter that should be argued to the jury. The court further ruled that the defendant could use the facts in the report to frame his questions to Ortiz, but could not read directly from the report. Counsel took exception to the ruling.

After the jury returned to the courtroom, defense counsel used the notes in the medical records as the basis for asking Ortiz whether he had observed "severe hemorrhaging of blood on [the defendant's] face or the back of his head," and whether he had seen that the defendant's eyes were swollen shut. Ortiz replied that he did not, or could not, recall. The court reminded counsel that "[y]ou may use the report to the extent that it assists you in [refreshing Ortiz' recollection]." After counsel concluded his cross-examination, each juror was provided with a copy of the defendant's medical records and given time to review it.

During his closing argument, defense counsel compared Ortiz' testimony that the defendant's injuries were minor with the defendant's medical records showing their severity, and referred to the officer's limited recollection of the defendant's condition after the incident. He also argued that a pending police department internal investigation of the incident provided the officers with a motive to understate the extent of the defendant's injuries.

"It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Aponte*, 249 Conn. 735, 749, 738 A.2d 117 (1999). "The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tend-

ing to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . .

"This right is not absolute . . . but may bow to other legitimate interests in the criminal trial process. . . . Such an interest is the trial court's right, indeed, duty, to exclude irrelevant evidence. The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . .

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . Furthermore, [t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 218–20,

690 A.2d 1370 (1997). With these principles in mind, we turn to the defendant's claim.

We conclude that the court did not abuse its discretion and the defendant was not denied his constitutional right of confrontation when counsel was precluded from quoting verbatim from the defendant's medical records during cross-examination of Ortiz.[2] The court did not forbid counsel from using the notes in the medical records to frame his questions to the officer. It merely restricted counsel from quoting directly from the report. In fact, immediately after the ruling, counsel asked Ortiz if he had observed severe hemorrhaging on the defendant's face or the back of his head and if he had noticed the defendant's severely swollen eyes. The wording of both questions closely followed the description of the defendant's injuries in his medical records. The defendant, therefore, was not restricted in any meaningful way from using the records to confront and impeach Ortiz.

Moreover, the medical records were admitted into evidence and copies were given to the jurors directly after the officer's testimony, thus affording them an opportunity to compare the records with the testimony just heard. During closing argument, defense counsel also compared the evidence of severe injuries in the defendant's medical reports with the testimony of Ortiz that the injuries were minor, and noted that Ortiz had a limited recollection of the injuries. Finally, counsel argued that a police department investigation provided Ortiz with a motive to minimize the defendant's injuries.

---

[2] In his reply brief, the defendant attempts to raise a new claim that the court improperly restricted his cross-examination of Ortiz with respect to the officer's medical records. "That claim was not raised in the [defendant's] original brief and violates the well established principle that issues may not be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Santiago* v. *State,* 64 Conn. App. 67, 69 n.2, 779 A.2d 775, cert. denied, 258 Conn. 913, 782 A.2d 1246 (2001). We therefore decline to review it.

Accordingly, the restrictions did not prevent counsel from confronting Ortiz with the information contained in the medical records and from later pointing out to the jury in closing argument the obvious discrepancies between the records and the officer's testimony. The claim must, therefore, fail.

II

The defendant next claims that the court improperly denied his motion for a mistrial or other remedial relief on the ground of prosecutorial misconduct during closing argument to the jury.[3] We do not agree.

The following facts are relevant to our resolution of this claim. The defendant's testimony differed in significant respects from that of the officers. The defendant testified that after an argument with Rosa regarding their infant son, he pushed Rosa aside with his hand and brought the baby to his crib. When he returned to the kitchen, Rosa was not there, but he saw the silhouettes of two other people standing in his apartment. As he approached them, he observed that they wore police badges and that one of the officers was smirking. The defendant demanded to know if the officers had a warrant, and, as he continued to approach them, one of the officers told him to "back the - - - - up." The defendant testified that the officers had not announced themselves and did not state that he was under arrest.

The defendant further testified that after the officers had told him that they did not have a warrant, he walked up to them and requested that they speak to him outside the apartment. At that moment, one of the officers struck him in the face with a nightstick. Both officers

---

[3] We do not address the defendant's claim that the court improperly denied his motion for a new trial because he raised that claim for the first time in his reply brief. See *Santiago* v. *State*, 64 Conn. App. 67, 69 n.2, 779 A.2d 775, cert. denied, 258 Conn. 913, 782 A.2d 1246 (2001).

then repeatedly struck him with their nightsticks, causing him to collapse on the floor. As he tried to cover his face, the officers continued to strike him. One blow that landed on his arm made his arm feel dead. Although he pleaded with the officers to stop, they continued to beat him. Finally, he rolled onto his stomach and stopped moving. At that point, Ocasio rolled him onto his back, stepped on his chest and sprayed him in the face with Mace so that he was unable to see or breathe. Thereafter, the officers dragged him out of the apartment on his stomach, causing large rug burns to his hip, and placed him in handcuffs. The defendant denied punching, attacking, kicking or charging the officers.

The defendant's testimony was corroborated in part by Pianka. Pianka testified that he was notified by another tenant of a commotion in the defendant's apartment. As he climbed the stairs and approached the apartment, he heard the police officers yelling, "Hands behind your back." When he entered the apartment, he saw the defendant lying face down on the floor with two officers beating him while one held him down with his foot. Pianka called out to the officers to stop hitting the defendant, but one of the officers told him to "shut the - - - - up" and continued striking the defendant. Pianka also testified that the defendant did not say anything or struggle with the officers while he was present. Ortiz ultimately chased Pianka from the apartment, brandishing his nightstick.

During the state's closing argument, the prosecution summed up the main issues in the case as follows: "The case, I think, is really very simple. There are a lot of exhibits. There are probably over thirty exhibits. There are all sorts of pictures, but the case really boils down to this: Who do you believe? You saw Officers Ocasio, Ortiz and Manning testify. . . . And I would submit that you saw their demeanor. You saw how they answered

questions, the straightforward manner in which they did that, that they are very believable witnesses."

Thereafter, the prosecutor invited the jurors to "compare [the officers'] testimony with the testimony of the defendant," and suggested that the possibility that the defendant might institute a civil lawsuit against the officers was indicative of the defendant's "want[ing] to hit the lottery. That's certainly an interest that he has in this case and an interest to not be truthful."[4] The state than asked the jury to recall that the defendant was "caught in a fib" because he stated that the injuries caused by the officers resulted in his loss of employment, although at the time of the arraignment he had been unemployed for four months. The state added: "He was not truthful with you when he said that. The judge will instruct you something along these lines: That if you believe a person has been deliberately false in their testimony with regard to a portion of their testimony, you have every right to question the entire testimony." The state also remarked that the testimony of Pianko, who corroborated in part the defendant's version of events, was filled with "exaggerations," "half-truths" and "deliberate falsehoods."

Immediately after the state's closing argument, the defendant requested a recess and moved for a mistrial, referring to the foregoing comments and accusing the state of blatant misconduct. Counsel noted that the prosecutor had called the defendant and Pianka liars while characterizing his own witnesses as truthful and believable. The court responded that the prosecutor's remark regarding deliberately false testimony was a proper comment as to whether the testimony of the

---

[4] During cross-examination of the defendant, the state noted that the defendant had notified the police of his intent to file a civil action. The court thereafter sustained an objection to the following question posed by the state: "And you're basically hoping to hit the lottery, aren't you? You want to get money."

witnesses was inadvertently or deliberately inconsistent with the evidence, as long as he did not "express his own personal belief as to what the witnesses have said and what credibility should be attached to them." It then denied the motion for a mistrial, concluding that the statements did not constitute an expression of personal belief with respect to the credibility of the witnesses.

Although the defendant did not request a curative instruction, the court instructed the jury that closing arguments should not be considered evidence. The court also advised that one of the jury's functions was to gauge the credibility of the witnesses, and that it was the jurors' prerogative to believe or disbelieve the testimony of any witness. The court explained that if the jurors believed that a witness had deliberately given false testimony in some respect, it could carefully consider whether to rely upon any of that witness' testimony. It advised the jury to subject the testimony of both the defendant and the officers to the same level of examination and scrutiny, and went on to instruct that, as is the case with other witnesses, the testimony of the officers should be considered for any possible bias or prejudice that the officers might have in the outcome of the trial.

After the defendant was found guilty of assault of a peace officer, the defendant filed a motion for a new trial, in part because of alleged prosecutorial misconduct during closing argument. The court denied the motion.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence

during trial a party has been denied the opportunity for a fair trial. . . . A reviewing court gives great weight to curative instructions in assessing error." (Internal quotation marks omitted.) *State* v. *Aponte*, 66 Conn. App. 429, 450, 784 A.2d 991 (2001), cert. denied, 259 Conn. 907, 789 A.2d 995 (2002).

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In [its] review of the denial of a motion for mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Downing*, 68 Conn. App. 388, 396–97, 791 A.2d 649, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002).

"We have long recognized the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment." (Internal

quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 302, 755 A.2d 868 (2000).

"Nevertheless, [i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . . Ultimately, therefore, the proper scope of closing argument lies within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Crnkovic*, 68 Conn. App. 757, 770–71, 793 A.2d 1139, cert. denied, 260 Conn. 925, 797 A.2d 521 (2002).

"Although a prosecutor is allowed latitude during closing argument, he cannot comment, directly or indirectly, as to the credibility, truth or veracity of witnesses. . . . The personal evaluations and opinions of trial counsel are at best boring irrelevancies and a distasteful cliche-type argument. At worst, they may be a vague form of unsworn and irrelevant testimony. . . . The fairness of the trial and not the culpability of the prosecutor is [however,] the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . Thus, improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant." (Citation omitted; internal quotation marks omitted.) Id., 771.

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court . . . has focused on several factors." *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include (1) the extent to which the misconduct was invited by defense conduct or argument,

(2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case. Id. Accordingly, we first must determine whether the prosecutor's conduct was improper and, if so, whether the misconduct was so serious as to deprive the defendant of his due process right to a fair trial.

We conclude that the prosecutor made improper comments regarding the credibility of the witnesses during his closing argument. In summing up the issues of the case, the prosecutor used his special position and influence to urge the jurors inappropriately that the officers were "very believable witnesses," that the defendant had an "interest to not be truthful,"[5] that the defendant was "caught in a fib" and that Pianko's testimony was filled with "exaggerations," "half-truths" and "deliberate falsehoods."

We, nonetheless, conclude that the prosecutor's misconduct did not substantially prejudice the defendant or deprive him of his right to a fair trial. Although the prosecutor's remarks were not invited by the defense, and although the credibility of the witnesses was a key issue in the case because there was no other independent evidence regarding the incident, the prosecutor's comments were not sufficiently severe or numerous to form a pattern of serious misconduct throughout the trial. Furthermore, the court's instructions to the jurors as to the credibility of the witnesses were more than adequate to cure any potential prejudice to the defendant that might have resulted. We note, in particular, the cautionary instruction regarding the possible bias of the police officers. We therefore conclude that the

---

[5] We note that the lottery reference also was inappropriate in light of the defendant's prior objection, which the court sustained.

prosecutor's comments could not reasonably have had a significant effect on the verdict or have violated the defendant's due process right to a fair trial, and the court did not abuse its discretion in denying the defendant's motion for a mistrial.

The defendant mistakenly relies on *State* v. *Crnkovic*, supra, 68 Conn. App. 757, and *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), to support his claim of reversible error due to prosecutorial misconduct. In *Crnkovic*, the defendant claimed that the prosecutor had improperly vouched for the credibility of the state's witnesses and otherwise expressed his personal opinions about the evidence during his summation and rebuttal argument to the jury. *State* v. *Crnkovic*, supra, 769. This court determined, however, that although the prosecutor's description of the police officers' testimony as "credible," "forthright," "honest" and "not cagey" was objectionable and improper, the comments were isolated and did not constitute a pattern of serious misconduct throughout the trial. Id., 771–72. Moreover, the trial court's instructions to the jury were adequate to cure any possible prejudice to the defendant that might have occurred. Id. *Crnkovic* thus fails to support the defendant's claim.

*Singh* also is inapposite. In *Singh*, our Supreme Court concluded that the cumulative impact of the prosecutor's improper cross-examination and closing argument, expression of personal views, reference to facts not in evidence, and appeal to the passions and prejudices of the jurors so infected the trial with unfairness as to render the defendant's conviction a denial of due process. *State* v. *Singh*, supra, 259 Conn. 723. Such is not the case here, as the only allegations of misconduct were the few comments in closing argument regarding the credibility of the witnesses and the comment regarding the lottery. Accordingly, neither *Crnkovic* nor *Singh* is persuasive in the present case.

## III

The defendant also claims that the court improperly barred him from making "missing witness" arguments with respect to three individuals the state would have been expected to call as witnesses.[6] We disagree.

On direct examination, Ortiz testified that the defendant struck him in the nose with his fist, causing pain and bleeding. When asked whether a physician had treated him for the injury, Ortiz replied that he had been treated that night at Hartford Hospital. On cross-examination, Ortiz further testified that his nose had been broken and that he had prepared a personal injury report to ensure coverage of the "surgery that I would need for my broken nose." Defense counsel then entered into evidence, without objection, Ortiz's emergency room record, which indicated that he was suffering from a "nasal contusion" and a "nasal polyp." The medical records also indicated that blood was observed in the right nostril, that there was a slight swelling to the bridge of the nose, and that the officer had been instructed to call an ear, nose and throat specialist. On redirect examination, Ortiz testified that he later had been seen by a specialist and had undergone surgery for the injury to his nose.

With respect to the officers, Ortiz, Ocasio and Manning all testified at trial. A number of other officers who responded to the call for assistance also were available, and five were subpoenaed by the· defense. The defense questioned two of those officers, but declined to call the remaining three as witnesses.

---

[6] The defendant characterizes this claim as constitutional. Our Supreme Court, however, has held that the failure to give a missing witness jury instruction involves an evidentiary, rather than a constitutional, issue. *State v. Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). We therefore conclude that a claim regarding the failure to permit a missing witness argument is also evidentiary in nature.

Prior to closing arguments, defense counsel sought the court's permission to argue that an adverse inference should be drawn against the state for its failure to call Ortiz' treating physician and two of the other officers who had responded to Ocasio's call for assistance. The state objected, and the court denied the defendant permission to make such an argument.

The defendant made an offer of proof under *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), noting that the state had mentioned the treating physician as a witness to prospective jurors during voir dire. Counsel also argued that because Ortiz had testified that he had suffered a broken nose requiring surgery, the state's failure to call Ortiz' treating physician had undermined the claim of assault involving the alleged injury. The court responded that the defendant could not mention the absence of the physician as a witness because the physician had no particular allegiance to one side or the other and either party could have called him as a witness.

The defendant further argued that two additional officers who had arrived at the scene within minutes after Ocasio and Ortiz should have been called as witnesses because they would have corroborated the testimony of their colleagues regarding the defendant's injuries. The court, however, barred any reference by counsel in closing arguments to the absence of those officers on the ground that the state was not required to bolster the testimony of witnesses who had testified and, further, that additional testimony would have been cumulative.

The defendant reasserted his claim as to the missing witness instruction in his motion for a new trial, but the court denied the motion. With respect to the physician, the court stated that he was not a person the

state reasonably would have been expected to call as a witness because the evidence that was presented was "sufficient . . . to make out the charge of assault on a peace officer regardless of whether his nose was ultimately broken or not."

"The defendant's claim arises as a result of the decision of our Supreme Court in *State* v. *Malave*, supra, 250 Conn. 722. In *Malave*, our Supreme Court abandoned, in criminal cases, the *Secondino* rule, also known as the missing witness rule, which sanctioned, under certain circumstances, a jury instruction that an adverse inference may be drawn from the failure of a party to produce a witness. Although our Supreme Court abandoned the rule [of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960)], it did not intend to prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . Comments in closing argument that do not directly exhort the jury to draw an adverse inference by virtue of the witness' absence do not necessarily fall under the ambit of *Secondino* . . . and accordingly are not forbidden by *Malave*. Our Supreme Court further provided that [o]f course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue. . . .

"The broad discretion vested in trial courts by *Malave* mirrors the general standards regarding the trial court's ability to limit closing argument. [T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by

improper matter that might prejudice its deliberations. . . . While we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, 67 Conn. App. 45, 48–49, 787 A.2d 11 (2001), cert. denied, 259 Conn. 911, 789 A.2d 996 (2002).

We conclude that the court did not abuse its discretion in precluding the defendant from making "missing witness" arguments. As the court properly observed, the absence of testimony by the physician did not expose a weakness in the state's case because the evidence was sufficient to support the charge of assault of a peace officer regardless of whether the officer's nose was broken or merely bruised.

The absence of testimony by two of the other officers who had been present at the scene of the incident also was undeserving of a missing witness argument. The state had asked all three officers who had contact with the defendant before he was handcuffed, Ocasio, Ortiz and Manning, to testify at trial. Similar testimony by other officers regarding the defendant's injuries would have been cumulative. Moreover, the defense subpoenaed five other officers who had responded to the call for assistance and questioned two. Because the defendant made no effort to call those witnesses to the witness stand, we have no choice but to conclude that the decision was made as part of the trial strategy of the defense, and he cannot now claim that their absence warranted a missing witness argument. See *State* v. *Graham*, 21 Conn. App. 688, 716, 575 A.2d 1057, cert. denied, 216 Conn. 805, 577 A.2d 1063 (1990). The defendant also gave no reason to believe that additional testimony by two of the other officers would differ from the testimony of the three officers that the state did call. Accordingly, we conclude that the court did not

abuse its discretion in denying the defendant's request to make missing witness arguments as to the treating physician and two of the other police officers who were present at the scene of the incident.

## IV

The defendant next claims that the court improperly instructed the jury on the essential element of "physical injury" as it pertained to the charge of assault of a peace officer. He claims that he filed a proposed jury instruction that correctly defined that element, took timely exception to the definition of physical injury that was given by the court and raised the issue anew in his motion for a new trial, which the court subsequently denied. We do not agree that the jury instruction was improper.

Prior to instructing the jury, the defendant filed a proposed instruction defining assault in the third degree in violation of § 53a-61 (a) (1). The instruction began by stating: "[I]nsofar as it applies here, our statutes define assault in the third degree as follows . . . ." The proposed instruction then described the essential elements of the crime, including physical injury: " 'Physical injury' is defined by our statutes as impairment of physical condition, or pain. The injury need not be serious or long-lasting. Nor need the physical injury be intended or caused by a weapon. Any degree of physical impairment or pain, however caused, is sufficient." The proposed instruction later stated that "in order for you to convict the defendant under this first count, the state must have proven beyond a reasonable doubt" that the defendant had the intent to cause physical injury and acting with that intent in fact caused physical injury to Rosa. The defendant did not propose an instruction for the charge of assault of a peace officer in violation of § 53a-167c.

The court first instructed the jury on the charge of assault in the third degree in violation of § 53a-61 (a) (1). In explaining the elements of that offense, one being physical injury to the intended victim, the court stated that "[p]hysical injury as used in this statute means impairment of physical condition or pain; that is, reduced ability to act as one would otherwise have acted. The law also does not require that the injury be serious; it may be minor."

The court next instructed on the charge of interfering with an officer. The instruction was lengthy, as there were many definitions that required explanation. The court finally instructed on the charge of assault of a peace officer in violation of § 53a-167c. In explaining the essential elements of that offense, the court stated: "For you to find [the defendant] guilty of this charge, the state must prove the following elements beyond a reasonable doubt: One, that the victim of the assault, as alleged in the information, Officer Ortiz, was a reasonably identifiable peace officer as I previously defined that term; two, that the conduct of [the defendant] occurred while Officer Ortiz was acting in the performance of his duties, again, as I've previously defined that term; three, that [the defendant] had the specific intent to prevent the peace officer, as I've previously defined intent, from performing his lawful duties; and four, that [the defendant] . . . caused physical injury to Officer Ortiz.

"So let me go through them again without making reference to my previous definitions, which I know that you'll apply . . . ." The court went on to explain that "[p]hysical injury is defined as impairment of physical condition or pain. The law does not require that the injury be serious; it may be minor."

After the jury was excused, defense counsel took two exceptions to the instructions. One of the exceptions

related to the definition of pain or physical injury in the instruction on assault in the third degree. Counsel stated that he never had heard physical injury explained as the "reduced ability to act as one would otherwise have acted," and that the defendant's requested instruction was based on the standardized instruction endorsed by the state judicial branch. Counsel reiterated his objection to the instruction in a colloquy with the court on the motion for a new trial.

"Our standard of review . . . is whether it is reasonably probable that the jury was misled. . . . The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Clark*, 68 Conn. App. 19, 28–29, 789 A.2d 549, cert. granted on other grounds, 260 Conn. 906, 795 A.2d 546 (2002).

Section 53a-3 (3) of the General Statutes defines physical injury as the "impairment of physical condition or pain . . . ." In the present case, the court instructed the jury that the element of physical injury, as it pertained to the charge of assault of a peace officer, "is defined as impairment of physical condition or pain. The law does not require that the injury be serious; it may be minor." This instruction is consistent with the definition in the

statutes, and we accordingly conclude that it is not reasonably probable that the jury was misled.

The defendant argues that the court's definition of physical injury in the earlier charge of assault was made part of its instruction on the assault of a peace officer when it prefaced the latter by remarking, "[s]o let me go through [the essential elements] again without making reference to my previous definitions, which I know that you'll apply . . . ." In its previous definition of physical injury, the court had explained that physical injury means the "reduced ability to act as one would otherwise have acted."

For the following reasons, we do not agree that the court's instructions misled the jury with respect to the charge of assault of a peace officer. First, the disputed instruction was given in relation to the charge involving Rosa, not Ortiz. Second, although the instruction on assault of a peace officer referred to the court's "previous definitions, which I know that you'll apply," and can be interpreted to incorporate the earlier language, the second assault instruction followed a lengthy instruction on the charge of interfering with an officer. It is, therefore, unlikely that the jury considered, or even recalled, the earlier language regarding physical injury when deciding the later assault charge. Finally, even if the earlier definition of physical injury had been applied to the later assault charge, it is unlikely to have had any prejudicial effect on the jury's deliberations, since the jury acquitted the defendant of the charge involving Rosa despite the allegedly improper instruction. Accordingly, we conclude that the court's instruction on the essential element of physical injury, as applied to the charge of assault of a peace officer, fairly presented the case to the jury and did not result in an injustice to either party.

V

The defendant's final claim is that the court improperly refused to instruct the jury that he had no duty to retreat from the officers who entered his home. We disagree.

The defendant submitted a request to charge the jury on the duty to retreat in the face of physical force inflicted by Ocasio and Ortiz. The proposed instruction stated: "You have heard testimony in this case that this incident took place inside [the defendant's] apartment. His status as a resident of that apartment gives him the right not to retreat in the face of attempts to push him back, or the use of force by police officers who either enter a dwelling or unlawfully use excessive force upon him. In other words, he did not have to back away or run away from the police officers in question in the face of their use or threatened use of force against him. Instead, his status as a resident of the premises gave him the right not to retreat from the officers once they entered onto his property, and into his home, and began to use force on him."

In its final charge, the court did not instruct on the duty to retreat. The court did instruct, however, with respect to the charge of interfering with an officer, that the defendant possessed a right to offer resistance, not rising to the level of an assault, to an unlawful entry by the police into his home. Thereafter, the defendant took exception to the omission of an instruction on the duty to retreat.

As previously stated, our standard of review is whether it is reasonably probable that the jury was misled. *State* v. *Clark*, supra, 68 Conn. App. 28. We are also guided by the principle that a requested instruction must be more than a correct statement of the law; it also must be relevant and not confusing to the jury.

See *State* v. *Lepri*, 56 Conn. App. 403, 414, 743 A.2d 626, cert. denied, 253 Conn. 902, 753 A.2d 938 (2000).

In the present case, the proposed instruction on the duty to retreat was not applicable to the charge of assault of a peace officer. That charge was based on the defendant's act of punching Ortiz in the nose, not his confrontation with the officers and his failure to retreat as ordered. Moreover, the state never argued that the defendant had a duty to retreat. A jury instruction that the defendant had a duty to retreat was, therefore, not relevant and would have confused the jury. Accordingly, we conclude that the jury was not misled by the court's failure to instruct on the duty to retreat with respect to the charge of assault of a peace officer.

The defendant, citing *State* v. *Lewis*, 220 Conn. 602, 618, 600 A.2d 1330 (1991), argues that because he was not required to retreat when the officers unlawfully entered his home, he was entitled to an instruction on this "theory of defense." The alleged "defense," however, was completely unrelated to the charge of assault. Furthermore, in its instructions on the charge of interfering with an officer, the court advised the jury that the defendant possessed a right to offer resistance, not rising to the level of an assault, to an unlawful entry by the police into his home. Accordingly, the defendant's claim has no merit.

The judgment is affirmed.

In this opinion the other judges concurred.