STATE OF CONNECTICUT *v.* JOHN DUPIGNEY
(AC 22611)

West, Landau and McDonald, Js.

Argued September 25, 2001—officially released July 22, 2003

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David J. Strollo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, John Dupigney, appeals from the judgment of conviction, following concurrent jury and court trials, of murder in violation of General Statutes § 53a-54a, carrying a pistol without a permit in violation of General Statutes § 29-35 (a) and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c. The defendant claims that (1) the court improperly allowed the admission of hearsay testimony in violation of his state constitutional right to confront witnesses, and (2) the prosecutor's closing argument improperly infringed on the defendant's state and federal constitutional rights to counsel by casting aspersion on the attorney-client relationship. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Morris Lewis, the victim, and Herbert Dupigney, the defendant's brother, were partners in an illegal drug selling enterprise in New Haven. The drug sales were conducted primarily at 304 Winthrop Avenue. Other members of the operation included Nick Padmore, an individuals known to the participants in the trial only

as "Ebony" and Eric Raven. In December, 1994, following the victim's incarceration, the defendant moved from Boston to New Haven to assist his brother in the drug operation. The defendant also enlisted an acquaintance from Boston, Derrick D'Abreau, to help with the drug sales. D'Abreau moved to New Haven in the beginning of January, 1995.

The victim was released from jail on January 23, 1995. That day, the victim telephoned Herbert Dupigney at the home of Carlotta Grinman. Grinman overheard the defendant tell his brother that that the victim "was not going get a . . . thing."

On January 24, 1995, at about 9:30 p.m., the victim met with the defendant, the defendant's brother, Herbert Dupigney, D'Abreau, Padmore, Raven and "Ebony" at 304 Winthrop Avenue. Upon his arrival at the building, the victim told everybody to leave because that was his location to sell drugs. As the argument escalated, the victim slapped the defendant and threw a chair at him. The victim then broke a bottle and attempted to attack the defendant. D'Abreau and Raven retreated to a turquoise Dodge Neon. The victim then started swiping the bottle at the occupants of the vehicle through one of its open windows. While Herbert Dupigney attempted to calm the victim and get him away from the car, the defendant inquired if anybody had a gun. In response, D'Abreau gave the defendant a .380 caliber pistol. The defendant then pointed the gun at the victim and told him to back off.

Herbert Dupigney and the defendant then entered the turquoise Dodge Neon and left the scene. The group proceeded to Eric's apartment at 202 Sherman Avenue. The defendant was visibly upset, and stated that the victim was getting on his nerves and that he was going to kill him. After a few minutes, the defendant and his brother left.

The defendant and his brother rejoined Eric and D'Abreau at 202 Sherman Avenue approximately one hour later. Between 11:15 p.m. and 11:30 p.m., all four individuals proceeded to 300 Winthrop Avenue, where the drug operation had rented a fourth floor room facing Winthrop Avenue. At that time, the victim was playing dice with Padmore and "Ebony" in front of 304 Winthrop Avenue. Herbert Dupigney went down to the street to try to smooth things over with the victim. It was understood that if the attempt at reconciliation was unsuccessful, then the victim would be shot. The defendant, Eric and D'Abreau observed the scene from the apartment's window. After a few minutes of conversation between the parties and with no overt indication that an accord had been reached, the victim, Padmore and "Ebony" walked off in the direction of Edgewood Avenue. Herbert Dupigney called out to "Ebony." After "Ebony" started to return, the defendant and Eric abruptly left the apartment.

As the victim and Padmore approached the corner of Winthrop Avenue and Edgewood Avenue, the turquoise Dodge Neon approached them. The defendant exited the vehicle and fired several shots at the victim. A brief struggle ensued, after which the defendant fired more shots at the victim. The victim died of his wounds shortly thereafter.

The defendant was charged with one count of murder in violation of § 53a-54a, one count of carrying a pistol without a permit in violation of § 29-35 and one count of criminal possession of a pistol or revolver in violation of § 53a-217c. The defendant pleaded not guilty to all three counts and elected to be tried to the jury on the charges of murder and carrying a pistol without a permit, and to the court on the remaining charge. All of the counts were tried concurrently. On March 31, 2000, the defendant was found guilty on all three counts

and later was sentenced to a total effective term of seventy years incarceration. This appeal followed.

## I

The defendant first claims that the court improperly admitted hearsay testimony pursuant to the excited utterance exception to the hearsay rule in violation of his right to confront witnesses under the Connecticut constitution. Specifically, the defendant claims that evidence may not be admitted pursuant to the excited utterance exception to the hearsay rule when the hearsay declarant is available to testify. The state conceded that the hearsay declarant was available to testify, but argues that unavailability is not a requirement for the admission of such hearsay evidence.[1]

In this case, the challenged evidence concerns the identification of the person who shot the victim as "Herbie's brother" by the aunt of one of the testifying witnesses. During trial, that witness, Aisha Wilson, identified the defendant as the one who had argued with and later shot the victim.

On direct examination, Wilson testified that at approximately 9:30 on the evening of January 24, 1995, she witnessed the victim and three other people engaged in an argument outside her building. Wilson

---

[1] The state also stated at trial that it could not, despite several attempts, locate the declarant and serve a subpoena on her. The declarant's niece testified that her aunt's name was Nancy and asked not to give her last name. Later, the niece testified that the aunt no longer lived in the area of the shooting and stated that she would not give her aunt's address. When asked what she would do if she was ordered by the court to disclose the address, she stated that she did not know what she would do. Defense counsel then asked the court to order disclosure, but later stated that he would be satisfied if the witness gave the address to the state. When the state advised the court that it would attempt to serve a subpoena on the declarant, the defendant agreed, and the court continued the subpoena for the witness, Aisha Wilson, so she could be brought back. Wilson was not brought back to testify about her aunt's address, and the declarant did not testify.

was able to identify two of those people as Herbert Dupigney and an individual known to her only as "Ebony." She recognized the third individual as someone whom she had seen in the neighborhood on a couple of earlier occasions, although she did not know his name. Her aunt told her that the third individual was Herbert Dupigney's brother.

The victim was yelling at the defendant, "Just shoot me, just shoot me." As the argument progressed, the victim broke a bottle and kicked over a chair. The victim then went after the defendant with the broken bottle. Thereafter, the defendant and his brother entered a turquoise colored car, while "Ebony" remained behind trying to calm the victim.

Later that same evening, at approximately 11:15 p.m., Wilson heard someone outside her apartment building yelling, "Help, help. Fire, fire." When she looked out of the window, she saw the victim bleeding and walking in the middle of the street. The same turquoise colored car in which the defendant and his brother previously had departed then returned. The individual that had been identified as Herbert Dupigney's brother, and whom she identified at trial as the defendant, exited the car and shot the victim.

Wilson later testified on cross-examination that she could not see the shooter's face from the apartment. She stated, however, that the shooter was wearing the same clothing as she had seen "Herbie's brother" wearing and that he arrived in the same car in which the defendant had departed earlier that evening. On redirect examination, Wilson then testified that she and her aunt had witnessed the shooting and the events leading to it from the window of the apartment in which they lived. Wilson testified that her aunt identified the shooter as Herbie's brother.

When the state asked Wilson what the aunt had said regarding the identity of the shooter, the defense objected, arguing that it was inadmissible hearsay. The prosecution argued that the statement was admissible as an excited utterance. The court overruled the defendant's objection. The state then asked Wilson, "And during the time of the shooting, did your aunt say anything to you about who the shooter was?" The witness replied, "She identified him as Herbie's brother."[2]

During final argument, defense counsel argued that Wilson's identification of the defendant was based, in

---

[2] The colloquy was as follows:

"[Prosecutor]: Ms. Wilson, [defense counsel] asked you questions about someone telling you the shooter was Herbie's brother?

"[The Witness]: Yes.

"[Prosecutor]: Now, while you were observing the shooting, the incident that happened between 11:15 and 11:30, was somebody else in the window with you observing that same shooting?

"[The Witness]: Yes.

"[Prosecutor]: And who was that?

"[The Witness]: That was my aunt.

"[Prosecutor]: And she was right with you?

"[The Witness]: Yes, she was.

* * *

"[Prosecutor]: Okay. Now, while you and your aunt were watching the shooting, was her emotional state similar to yours?

"[The Witness]: Yes.

"[Prosecutor]: And while that shooting was going on, what did your aunt say in regard to who the shooter was?

"[Defense Counsel]: I'm going to object, Your Honor.

"The Court: Sustained.

"[Prosecutor]: Your Honor, I—

"The Court: I'll listen to you . . . . Go ahead, what's your—

"[Prosecutor]: Spontaneous utterance, Your Honor. . . . Essentially, I think it meets all the elements."

A discussion was held off the record, and then the prosecutor continued redirect examination.

"[Prosecutor]: And during the time of the shooting, did your aunt say anything to you about who the shooter was?

"[The Witness]: Yes.

"[Prosecutor]: What did she say?

"[The Witness]: She identified him as Herbie's brother.

"[Prosecutor]: As Herbie's brother?

"[The Witness]: Yes."

part, on the fact that "someone, Wilson's aunt, said 'the person was Herbie's brother.' " Defense counsel also stated that Wilson's identification was based on the leather jacket that the defendant was wearing when he earlier argued with Lewis, the jacket worn by the person who had later shot Lewis and the statement that "[Wilson's] aunt said it was Herbie's brother."

As part of the defense strategy, defense counsel asked Wilson, who did not know the defendant, if she had learned from someone who shot Lewis. That broad question and its answer could be subject to many interpretations, as was later developed in the testimony. On recross-examination, defense counsel later elicited from Wilson that her aunt had twice identified Herbert Dupigney's brother—earlier on the evening in question, when the defendant and the victim had a violent argument, after which the defendant drove away, and later that same evening when the defendant and others returned in the same car, and a passenger from that vehicle repeatedly shot the victim.

The United States Supreme Court has held that the admission into evidence of a spontaneous declaration does not violate the federal constitution's confrontation clause. See *White* v. *Illinois*, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992). As the court has stated, there can be no doubt that the spontaneous utterance or the spontaneous declaration exception to the hearsay rule is "firmly rooted," carrying sufficient indicia of reliability to satisfy the reliability requirement of the confrontation clause. Id., 355 n.8.

Our Supreme Court has recognized that irrespective of the hearsay declarant's availability, evidence admitted under a firmly rooted exception to the hearsay rule does not violate the federal constitution's guaranteed right to confront one's accusers. See *State* v. *Damon*, 214 Conn. 146, 159, 570 A.2d 700, cert. denied, 498 U.S.

819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990). We recognize that the unavailability of the declarant is not a prerequisite for the admission of a spontaneous utterance or declaration under the Connecticut rules of evidence and that this formulation of the exception to the hearsay rule is firmly rooted in Connecticut law. See *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989); see also Conn. Code Evid. § 8-3 (2); *State* v. *Westberry*, 68 Conn. App. 622, 627, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.11.1, p. 373.

In the present case, the defendant has grounded his confrontation claim on article first, § 8, of the constitution of Connecticut, in addition to the federal constitution. The specific question of whether, when it has not been established that the hearsay declarant is unavailable, the admission of a spontaneous utterance identifying an individual as the perpetrator of a crime, while admissible under our rules of evidence, violates a defendant's right of confrontation under the constitution of Connecticut is an issue of first impression. Because we conclude that the challenged evidence was merely cumulative of other, properly admitted evidence, we need not reach the constitutional question. See *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) ("We . . . do not engage in addressing constitutional questions unless their resolution is unavoidable. 'Ordinarily, [c]onstitutional issues are not considered unless absolutely necessary to the decision of a case . . . .' ").

Although the admission of an unavailable declarant's prior statements of identification give rise to confrontation clause issues; *State* v. *Outlaw*, 216 Conn. 492, 503, 582 A.2d 751 (1990); the admission of such evidence is still subject to harmless error analysis. See *State* v. *Casanova*, 255 Conn. 581, 595, 767 A.2d 1189 (2001). "If an impropriety is of constitutional proportions, the state bears the burden of proving that the error was

harmless beyond a reasonable doubt." *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996), citing *State* v. *Colton*, 227 Conn. 231, 253–54, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

"Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Cuesta*, 68 Conn. App. 470, 475, 791 A.2d 686, cert. denied, 260 Conn. 914, 796 A.2d 559 (2002), quoting *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).

Upon a review of the entire record, we conclude that the hearsay evidence identifying the assailant as Herbert Dupigney's brother was cumulative of other testimony and, therefore, unlikely to have affected the outcome of the trial. See *State* v. *Dehaney*, 261 Conn. 336, 364, 803 A.2d 267 (2002). Padmore contacted the New Haven police shortly after the murder, claiming to have information regarding the crime. The police interviewed him on February 1, 1995. At that time, he provided the police with a taped statement identifying the defendant as the assailant. He also identified the defendant as the shooter from a photographic array

and signed the defendant's photograph.[3] Both the taped statement and the photograph were admitted into evidence under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

D'Abreau testified that he was an eyewitness to the murder. He observed the shooting from the fourth floor windows of the apartment building at 300 Winthrop Street and was able to identify the defendant as the assailant on the basis of the clothing that the defendant was wearing at the time of the murder. In addition to his personal observation, D'Abreau testified that the dispute over drug dealing had been discussed previously and that if the disagreements could not be resolved, the defendant was going to shoot the victim.

Wilson also testified that she was an eyewitness to the shooting. Her aunt's statement, admitted through Wilson's testimony, did not provide the basis for Wilson's testimony that it was the defendant who had murdered the victim. Wilson personally observed the shooting and recognized the assailant as the individual that she had seen arguing with the victim earlier in the evening. Wilson knew that person as an individual that she had seen in the neighborhood on several previous occasions. In court, Wilson identified the defendant as the assailant on the basis of her personal observation of the crime, and she denied that her aunt's statement had influenced her identification. In sum, the hearsay statement of Wilson's aunt added little to the evidence before the jury.

[3] At trial, Padmore claimed to have been under the influence of illegal drugs while at the New Haven police station and denied any memory of either providing the statement to the police or choosing the defendant's photograph from the array. The police detective who interviewed Padmore at the station testified that he appeared clearheaded and sober while at the station.

Because the challenged hearsay was cumulative of other evidence identifying the defendant as the assailant, and the jury had before it substantial independent evidence from which it could find the defendant guilty of the charged offense, it cannot be said that the admission of the spontaneous utterance affected the result of the trial. See *State* v. *Coltherst*, 263 Conn. 478, 519, 820 A.2d 1024 (2003) (exclusion of testimony harmless where it was not reasonably possible such exclusion influenced jury's determination on ultimate question of defendant's guilt).

## II

The defendant next claims that during closing argument to the jury, the prosecutor improperly commented on the defendant having rehearsed his testimony. The defendant claims that the prosecutor's remarks were meant to imply that defense counsel and the defendant had conspired to concoct an alibi and that, as a result, those comments infringed on the defendant's right to counsel as guaranteed by the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut.[4] We disagree.

We first set forth our standard of review for claims of prosecutorial misconduct alleging the violation of a specific constitutional right. "In determining whether [a] claim of prosecutorial misconduct deprived the

[4] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

The fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 8, of the constitution of Connecticut, as amended by article twenty-nine of the amendments, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

defendant of his due process right to a fair trial, we must first decide whether the prosecutor's remarks were, in fact, improper . . . ." (Internal quotation marks omitted.) *State* v. *Hicks*, 56 Conn. App. 384, 390, 743 A.2d 640 (2000). If the prosecutor's comments are found to be improper, we must then determine whether the natural and necessary impact of those comments is such as to violate the specific constitutional right alleged. *State* v. *Morgan*, 70 Conn. App. 255, 296, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

We have recognized that "prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial . . . ." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 700, 793 A.2d 226 (2002), quoting *State* v. *Burton*, 258 Conn. 153, 165, 778 A.2d 955 (2001). "Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Internal quotation marks omitted.) *State* v. *Pereira*, 72 Conn. App. 545, 553, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003).

The defendant testified that at the time of the shooting, he was with Diane Butler, away from the scene of the shooting. Butler also had testified to that effect. On cross-examination, Butler stated that she met with the defendant nine times between the time of the killing and the trial. She also testified that at some time or another, she had discussed with the defendant his whereabouts on the day of the shooting.

In support of his claim, the defendant cites the prosecutor's comments asking the jury to "[t]hink about when [the defendant] gave his alibi [as] being with Ms. Butler. He clearly was pretty well darn pat on where he was

at the exact time of the shooting. He was pretty darn clear about that. Then I started asking him some more questions about the next morning. All of a sudden, there's these long, long pauses of silence, and he's looking around. Question after question. What did you do in the morning? What did you do in the afternoon? Where did you go? Where did Ms. Butler go? Lots and lots of silence. He wasn't ready for that. He wasn't rehearsed on that."

Although the defendant attempts to make something sinister of it, the quoted language is, in essence, no more than an attack on the defendant's credibility as a witness. "While a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 401, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999). In the present case, the prosecutor's comments constituted legitimate argument regarding the defendant's credibility and were not an expression of personal opinion. See *State* v. *Wickes*, 72 Conn. App. 380, 389, 805 A.2d 142 (prosecutor entitled to argue that evidence shows defendant's testimony not credible), cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002); cf. *State* v. *Cruz*, 71 Conn. App. 190, 206, 800 A.2d 1243 (improper for prosecutor to express personal opinion regarding credibility of witnesses), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

The prosecutor's closing argument was based on the evidence adduced at trial. The prosecutor discussed the demeanor of the defendant while testifying and the discrepancies between the defendant's memory regarding where he was and what he did on the night of the murder relative to his weak recollection of events shortly thereafter. The prosecutor merely asked the jury

to draw a reasonable inference from the evidence that the defendant's power of recall was conveniently limited to the time period necessary to establish his alibi. We conclude, therefore, that the prosecutor's comments regarding the defendant's credibility were not improper.

The judgment is affirmed.

In this opinion the other judges concurred.