## STATE OF CONNECTICUT *v.* ABARA ROSE
### (13394)

Spear, Hennessy and Freedman, Js.

---

702

Argued January 16—officially released June 18, 1996

*William Andrew Lichtenfels*, special public defender, with whom, on the brief, was *Sandra Crowell*, certified legal intern, for the appellant (defendant).

*Christopher T. Godialis*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Vicki Melchiorre*, assistant state's attorney, for the appellee (state).

FREEDMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of unlawful restraint in the first degree in violation of General Statutes § 53a-95,[1] threatening in violation of General Statutes § 53a-62 (a) (2),[2] reckless burning in violation

---

[1] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[2] General Statutes § 53a-62 (a) provides in pertinent part: "A person is guilty of threatening when . . . (2) he threatens to commit any crime of violence with the intent to terrorize another, to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience . . . ."

of General Statutes § 53a-114 (a),[3] and risk of injury to a child in violation of General Statutes § 53-21.[4] On appeal, the defendant claims that he is entitled to a new trial because (1) the state impermissibly cross-examined him about his postarrest silence in violation of the federal and state constitutions, and (2) he was deprived of his constitutional right to an adequately instructed jury because the trial court did not relate the facts of the case to the law in the jury instructions. We affirm the judgment of the trial court.

The defendant was initially charged, in two separate informations, with six counts. In the first information, based on an incident that occurred on November 1, 1992, the defendant was charged with reckless burning and risk of injury to children.[5] In the second information, based on an incident that occurred on August 4, 1993, the defendant was charged with attempted assault in the first degree, unlawful restraint in the first degree, reckless endangerment in the first degree and threatening.

Regarding the first incident, the jury could have reasonably found the following facts. On November 1, 1992, Lugine Kemp, her three children and the defendant were living together in a rented apartment. On that evening, Kemp and the defendant had an argument. The defendant went downstairs and Kemp stayed upstairs and went

---

[3] General Statutes § 53a-114 (a) provides: "A person is guilty of reckless burning when he intentionally starts a fire or causes an explosion, whether on his own property or another's, and thereby recklessly places a building, as defined in section 53a-100, of another in danger of destruction or damage."

[4] General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[5] An additional charge in this information was nolled by the state during the trial.

to bed. Kemp's six year old daughter later awoke her and said that the house was on fire. As she exited her bedroom, Kemp saw flames between the bedroom and the bathroom. She noticed that the items burning were a piece of paper on top of a T-shirt and a piece of plywood. Kemp left the house with her children. Once outside, she did not see the defendant. Kemp then went to a neighbor's house to call the police, who called the fire department. The firefighters did not find fire in the house. Kemp spent the night at her mother's house.[6]

Detective Thomas Goodrow of the arson unit of the Hartford police department was called to the scene that evening. Outside, he found and obtained as evidence "what appeared to be the remnants of at least two T-shirts on top of a piece of lauan boarding."[7] When he went inside the apartment, Goodrow noticed a strong smell of smoke and a haze. On the basis of Goodrow's investigation, all natural and accidental causes for the fire were ruled out, and it was concluded that the fire "was unquestionably incendiary in nature, a deliberate act of arson, human" that created "a significant danger" to the building and its occupants.

Regarding the second incident, the jury could have reasonably found the following facts. On August 4, 1993, Lawunna Smith left work at approximately 4:40 p.m. and proceeded to walk home across a vacant lot when she was approached by the defendant, who was a friend of hers. The defendant came up to Smith, moving as if he were going to put his arm around her, and poured what smelled like gasoline on Smith from a green soda bottle that he had in his hand. The gasoline fell onto Smith's chest and neck area, and she was afraid. As he poured the gasoline on Smith, the defendant asked her

---

[6] Kemp did not see the defendant until one week later, at which time the defendant apologized to Kemp and told her that he would never try to hurt her and the children.

[7] Goodrow described lauan boarding as very low grade, thin paneling.

whether she had ever been burned or had ever seen a person get burned. Smith tried to get away but the defendant pulled and hit her and punched her in the stomach. He then produced a book of matches from his pants pocket and "took a single strike from the book of matches." Smith was frightened and crying, believing that the defendant was going to strike the match and throw it on her. She again tried to get away, but was unable to because "every step [she] would take he was right there." Smith tried to talk to the defendant, asking the reason for his behavior. The defendant then put away the matches and pulled out a paring knife, which he held to Smith's neck while he threatened to kill her. The defendant eventually put the knife away and Smith ran to her aunt's house nearby.

Smith stayed at her aunt's house until she felt sure that the defendant was not around. On her way home, Smith stopped at the home of her friend, Michael Tiggett. Smith was shaking when she arrived at Tiggett's house, and she told Tiggett what had occurred. At this point, the defendant was sitting across the street in front of Tiggett's house. Tiggett went outside and spoke to the defendant, who then left, but said he would be back.

Smith eventually went back to her aunt's house and called the police. Officer Michael Gaffney of the Hartford police department responded to the call and found Smith to be "covered with what appeared to be gasoline." Gaffney telephoned Goodrow of the arson unit and obtained Smith's clothing as evidence.[8] Gaffney then went to pick up the defendant at his apartment. Goodrow accompanied Smith to the area where her encounter with the defendant had taken place. He found

[8] The clothing was put in a sealed can and transported by Goodrow to the state forensics lab in Meriden for analysis. The results came back "indicative of a by product of gasoline."

a green soda bottle on the ground that he collected as evidence. The result of the lab test on the bottle indicated evaporated gasoline.

I

The defendant first claims that he is entitled to a new trial because the state impermissibly cross-examined him about his postarrest silence in violation of the fourteenth amendment to the federal constitution and article first, § 8, of the Connecticut constitution. Specifically, the defendant claims that his right to due process was violated under *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), when the prosecuting attorney questioned him about his postarrest silence and when the state presented testimony in its case-in-chief that referred to the defendant's postarrest silence. At trial, the defendant did not object to the introduction of this evidence and thus brings this claim under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"Under *Golding,* a defendant can prevail on an unpreserved claim of constitutional error 'only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.' . . . The first two conditions are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself." (Citation omitted.) *State* v. *Crosby,* 34 Conn. App. 261, 264, 641 A.2d 406, cert. denied, 230 Conn. 903, 644 A.2d 916 (1994). "In harmony with the objective of

*Golding*, the defendant's claim may be disposed of 'by focusing on whichever condition is most relevant in the particular circumstances.'" *State* v. *Cooper*, 227 Conn. 417, 440, 630 A.2d 1043 (1993).

Regarding the August 4, 1993 incident,[9] the state, as part of its case-in-chief, presented the testimony of Goodrow. According to Goodrow, after the defendant had been brought to the police station by Gaffney, Goodrow spoke with him in an interview room. After advising the defendant of his rights, the defendant refused to sign a waiver form.[10] Prior to Smith's coming in to identify the defendant, Goodrow went over the charges against the defendant, at which point the

---

[9] Although the defendant claimed at oral argument that the claimed *Doyle* violation applies to both the November 1, 1992 incident and the August 4, 1993 incident, we agree with the state that this claim is limited to the information that charged offenses on August 4, 1993, against the victim Smith.

[10] The transcript reveals the following:

"Q. Okay, prior to trying to talk to the accused, did you advise him of his rights?

"A. Oh yeah, yeah, with the standard form.

"Q. Okay, what are those rights that he is advised of?

"A. Well, the way I normally do it, it's policy for the department and it's my procedure, it works very well with me, I explain to the individual that he's been charged with some very serious crimes and right now he's under arrest, there is no discussion about that. He's under arrest and in fact I'd like to give him an opportunity to explain what happened. But before I hear his side of the story he has to fill out a waiver of his right, he has to know he doesn't have to say anything to me and right down the line.

"Q. So did you read him his rights?

"A. I paraphrased the rights and then I put the form in front of him and said let's go over them one by one and I want you to initial and at that point he says I'm not signing anything.

"Q. All right, so you read him his rights and you showed him a form? Is this some kind of standard police form?

"A. Standard police form.

"Q. And you attempted to go through the rights, what individually you said?

"A. Yes.

"Q. And his response was he what?

"A. He didn't want to sign anything. And at that point I realized that we weren't going to go anywhere with the interview."

defendant stated that he "was there but . . . didn't throw the gasoline."[11]

During the cross-examination of the defendant, the state elicited information from the defendant regarding his statements to Goodrow. The defendant testified regarding his statement that Smith was his girlfriend,[12]

---

[11] The transcript reveals the following:

"Q. Before bringing the victim in . . . did you talk to the defendant?

"A. Yeah, I told him I says you know you don't have to talk to me, but I says you know here's what you're going to be charged with. And I went right down the charges and I says you know, how could you throw gasoline at the woman? My gosh, don't you know what's gonna happen? And at that point he came up with I was there but I didn't throw the gasoline."

[12] The transcript reveals the following:

"Q. Now when you got to the police station they asked [Smith] to identify you as the one who did this to her, didn't they?

"A. Yeah.

"Q. And she did, didn't she?

"A. Yeah.

"Q. And you identified [Smith] as your girlfriend, didn't you, to the detectives?

"A. Yeah.

"Q. But now you just told us that you had broken off the relationship with her a couple of weeks prior to this, why did you identify her to Detective Goodrow as your girlfriend?

"A. Detective come and ask me this woman is who to you? After he ask me who this woman I say this is my girlfriend.
* * *

"Q. [A]nd so you gave him an incorrect answer. If you're in fact telling us that you broke off this relationship a couple of weeks prior to the August 4 incident?

"A. Yeah.

"Q. You're misleading the detective, you're telling him that she's your girlfriend?

"A. Yeah.
* * *

"Q. And after she made the statements about how she didn't want anything to do with you and you weren't her boyfriend and all this, what was your response?

"A. I have no response at the locked door.

"Q. You hung your head, didn't you?

"A. I hang no head. The—

"Q. You hung your head, didn't you?

"A. No."

that Goodrow had advised him of his rights,[13] and that the defendant never told Goodrow that the fight he and Smith had was about money.[14] The testimony then turned to whether Goodrow had allowed the defendant to make a statement after he was advised of his rights[15] and the defendant's claim that he was not given an opportunity to tell his side of the story.[16] Following a lunch recess, the court pointed out that "[a]lthough [defense counsel] did not interpose any objections, dur-

---

[13] The transcript reveals the following:

"Q. And so when you went down there and Detective Goodrow talked to you, do you remember him advising you of your rights?

"A. He asked me, read me the rights, when they carry me down to the station and put me in the room."

[14] The transcript reveals the following:

"Q. And you never told the detective that the fight you two had was about money, as you claim now? Is that correct?

"A. No I never tell—he ain't ask me that. He just—when afterwards the thing done happen he done gone speak with the girl whatever."

[15] The transcript reveals the following:

"Q. Now when the detective testified that he asked you if you want—after he read you your rights and he asked you if you wanted to make a statement he testified you said no you didn't want to make a written statement. . . . And then he asked you if you wanted to tell him your side of the story, did he not?

"A. He ask me, when I explain, tell him what goin' on he ain't want to listen. He, instead I tell what goin' on he tellin' me what was said. Like when I talk to you so like similar something like what you saying, too. Like I go and say something you like put the words into my mouth for said something. Something like that he doin'.

"Q. So he didn't give you a chance to talk, is that what you're telling me?

"A. No every time I talk he tellin' me what happen, is what he doin', he tellin' me.

"Q. Well did you think he was trying to tell you what Lawunna Smith was claiming happened in the park? Did you think he was trying to make you aware of what she said and that these were serious charges?

"A. The kind of way we talkin' what he was saying to me I saying she said this, she said that. When I go for explain to he keep bringing what she said. He ain't ready to hear my side or nothing, or what I got for said."

[16] The transcript reveals the following:

"Q. Okay and did you deny that you did these things?

"A. I tell you I did not do it.

"Q. Okay and did you tell him that the reason you had met her in the park was because she owed you money?

ing the luncheon recess the court pointed out to both counsel that the state's inquiries . . . into his things he didn't say to the police would not be viewed with favor."

"The state's use for impeachment purposes of a defendant's silence following receipt of *Miranda*[17]

"A. He ain't wait for explain all and tell, he just—

"Q. Oh, he never gave you a chance to give that explanation, is that what you're telling us?

"A. That's right.

\* \* \*

"Q. [W]ere you trying to tell him what happened? Your version of what happened?

"A. He wait for I know what happened.

"Q. He never wait for it, he never gave you a chance to tell his side?

"A. Nope.

"Q. And so after they took [Smith] out of the room?

"A. This long before, this long before . . . .

"Q. Just took, that's it just locked you up?

"A. This long before they took [Smith] and come back.

"Q. And there wasn't any time gap in there after they took [Smith] out when she was not talking and the detective was not talking when you had a chance to get your version of what happened in there?

"A. Well I ain't have no chance talk—how I'm gone talk to me self in one big room? I can't talk to me self, both of them gone.

"Q. Everybody just left you alone in the room?

"A. That's right.

"Q. So you had no other chance?

"A. I who I gone talk to, the wall?

\* \* \*

"Q. So you never got a chance to tell anyone else that night that you wanted to tell them what happened, you wanted to make a statement?

"A. No.

"Q. [S]o you were arrested on August 4, is that correct?

"A. Yeah.

"Q. And today is . . . November 1?

"A. First, yeah.

"Q. During that time you had no opportunity to tell anybody your side of the story, is that correct?

"A. Only person I tell side story is my attorney.

"Q. To your attorney? And you never had another chance to tell anyone down at the police station your story?

"A. No.

"Q. Did you ever try to tell anyone down there your story?

"A. Nobody even watch me."

[17] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

warnings violates due process. . . . Silence following *Miranda* warnings is 'insolubly ambiguous' because it may be nothing more than a defendant's exercise of his or her *Miranda* rights. . . . Once the government assures a defendant through the issuance of *Miranda* warnings that his silence will not be used against him, it is fundamentally unfair for the state to break that promise by using his silence against him at trial. . . . Comments by the state on a defendant's silence following *Miranda* warnings are not only constitutionally impermissible, but also inadmissible under the principles of evidence." (Citations omitted.) *State* v. *Crosby*, supra, 34 Conn. App. 266–67. It is permissible, however, for the state to present such evidence to "show the investigative effort made by the police and the sequence of events as they unfolded." (Internal quotation marks omitted.) *State* v. *Casey*, 201 Conn. 174, 183–84, 513 A.2d 1183 (1986).

"The principles of *Doyle* do not apply where the record fails to indicate 'that the silence of a defendant has been preceded by a *Miranda* warning . . . .' *State* v. *Leecan*, [198 Conn. 517, 524, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986)] . . . ." (Citation omitted.) *State* v. *Crosby*, supra, 34 Conn. App. 267. The state argues that as to Goodrow's testimony, the record is inadequate to review this claim because the record does not adequately reflect that the defendant was ever asked to sign a waiver form. We disagree. Goodrow testified that he advised the defendant of his rights and the defendant refused to sign anything.[18] Moreover, as correctly pointed out by the defendant, the state, in questioning the defendant on cross-examination, specifically referred to Goodrow's having advised the defendant of his rights.[19]

---

[18] See footnote 10.

[19] The state asked the following question of the defendant: "Now when the detective testified that he asked you if you want—*after he read you*

"The first two conditions of *Golding* are met here. An adequate record for review exists because the record indicates that the defendant received [*Miranda*] warnings regarding the right to remain silent, and the defendant's claim is constitutional in nature because it alleges a violation of due process under *Doyle*. We must, therefore, consider the merits of the defendant's claim." *State v. Crosby*, supra, 34 Conn. App. 269. We conclude, however, that under the facts of this case, an alleged constitutional violation does not clearly exist and the defendant was not deprived of a fair trial.

With respect to Goodrow's testimony that the defendant "didn't want to sign anything," we conclude that this does not constitute improper evidence of silence. Rather, such testimony was elicited, not for the purpose of impermissibly commenting on the defendant's exercise of his rights pursuant to *Miranda*, but rather to show "the investigative effort made by the police and the sequence of events as they unfolded . . . ." (Internal quotation marks omitted.) *State v. Casey*, supra, 201 Conn. 183. As such, this testimony was permissible.

With respect to the cross-examination of the defendant, we agree with the state that because the defendant did not remain silent in reliance on *Miranda* warnings, the questioning was proper. " '[T]he *Doyle* . . . rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.' *United States v. Crowder*, 719 F.2d 166, 172 (6th Cir. 1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2352, 80 L. Ed. 2d 825 (1984)." *State v. Joly*, 219 Conn. 234, 256–57 n.15, 593 A.2d 96 (1991). Regarding the state's inquiry of the defendant as to the fact that he never

*your rights* and he asked you if you wanted to make a statement he testified you said no you didn't want to make a written statement. . . . And then he asked you if you wanted to tell him your side of the story, did he not?" (Emphasis added.)

told Goodrow that he had fought with Smith about money, this question concerned the defendant's prior admission that he and Smith had argued. When asked why he did not give this information to Goodrow, he responded that he was not asked to and that he never got a chance to. The defendant repeatedly indicated that Goodrow would not listen to him when he attempted to speak. Because silence and gestures that are not the product of reliance on *Miranda* are not protected; *State* v. *Joly*, supra, 257; *State* v. *Taft*, 25 Conn. App. 149, 593 A.2d 973, cert. denied, 220 Conn. 918, 597 A.2d 343 (1991); we conclude that the defendant has not shown that a constitutional violation clearly existed that deprived him of a fair trial.

## II

The defendant next claims that he is entitled to a new trial because he was deprived of an adequately instructed jury. Specifically, the defendant argues that the trial court failed to relate the facts of the case to the law in its charge to the jury. The defendant concedes that this claim was not properly preserved in the trial court, but claims that it is nonetheless reviewable under the doctrine of *State* v. *Golding*, supra, 213 Conn. 233.

"In reviewing a constitutional challenge to the trial court's instructions, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995). "In assessing whether a jury reasonably could have been misled by the court's instructions . . . it is always proper to consider

whether the issues in the case are complicated." Id., 514–15.

In *State* v. *Lemoine*, supra, 233 Conn. 512, the Supreme Court concluded that "review of or comment on the evidence is not constitutionally mandated where the trial court, in the exercise of its sound discretion, determines that such commentary is not necessary and that the jury would be properly instructed and not misled in its absence." In so holding, the Supreme Court noted that "[i]t has long been established that [i]n properly instructing the jury it *may or may not* be necessary for the court to recall the attention of the jury to the evidence and to the facts which the State and the accused respectively claim to have established, or to comment upon the evidence or express an opinion as to its weight, or as to what verdict would be proper if the jury should find certain facts to have been proved. The charge should be so framed that the jury may clearly understand the matters which are submitted to them. . . . It is within the province, and may be within the duty, of the trial judge to not only call attention to the evidence adduced, but to state to the jury in the charge his own opinion of the nature, bearing and force of such evidence. . . . It is not necessarily error to omit *all* comment upon the bearing and weight of evidence; and generally the extent to which the court should discuss the evidence in submitting a case to the jury is, so long as in criminal cases the jury [is] not directed how to find [its] verdict, *within the discretion of the trial judge.* . . . *State* v. *Long*, 72 Conn. 39, 43, 43 A. 493 (1899)." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Lemoine*, supra, 233 Conn. 510–11.

As in *Lemoine*, the trial court in the present case, after the close of the evidence and final arguments of counsel, instructed the jury as to the law applicable to all of the charges against the defendant. The court then

instructed the jury as to the elements the state must prove as to each crime charged in the two informations in order to convict the defendant. The court specified in its instructions the victims to which the various charges against the defendant applied, and the jury had the informations during deliberations.

In *Lemoine*, although the defendant was charged with nine separate counts in the information, the Supreme Court noted that the evidence related to those charges was not complicated and the charges arose out of three separate and distinct incidents. *State* v. *Lemoine*, supra, 233 Conn. 515. In the present case, the defendant was charged, in one information, with reckless burning and risk of injury to children based on the allegation that the defendant started a fire in an apartment on November 1, 1992. In the other information, the defendant was charged with attempt to commit assault in the first degree, unlawful restraint in the first degree, reckless endangerment in the first degree and threatening, all based on the defendant's encounter with Smith on August 4, 1993. The two incidents were not similar. Moreover, as in *Lemoine*, the final arguments of counsel thoroughly reviewed the testimony elicited by the witnesses. We conclude, on the basis of the foregoing, that it was not reasonably possible that the jury was misled by the trial court's instructions and no injustice to the defendant resulted by reason of the court's instructions. See id., 516; see also *State* v. *Glover*, 40 Conn. App. 387, 393–94, 671 A.2d 384, cert. denied, 236 Conn. 918, 673 A.2d 1145 (1996).

The judgment is affirmed.

In this opinion the other judges concurred.