## STATE OF CONNECTICUT *v.* JUSTIN C. PEPPER
### (AC 23376)

Dranginis, McLachlan and Hennessy, Js.

2

Argued June 2—officially released August 26, 2003

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Lawrence J. Tytla*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Justin C. Pepper, appeals from the judgment of conviction, rendered following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). On appeal, the defendant claims that (1) the trial court denied him his constitutional right of confrontation by precluding him from questioning the victim about her motive to accuse him falsely of sexual assault, (2) pursuant to *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the state violated his constitutional rights by using his postarrest and post-*Miranda*[1] silence for impeachment purposes and substantive evidence of

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

guilt, and (3) the state committed prosecutorial misconduct by asking him to comment on the credibility of the victim and the veracity of her testimony. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts.[2] On April 23, 2001, at 11:30 p.m., the victim was in her residence with her husband and her one year old daughter, who were asleep, when the defendant knocked on her door uninvited. The defendant appeared upset and wanted to speak with the victim's husband. The victim woke her husband so that he could get ready for work, which began at midnight. Her husband left for work at 11:45 p.m., but the defendant remained. The defendant and the victim conversed about what was upsetting the defendant. During their conversation, both drank alcoholic beverages. The victim then began to drink soda.

At 12:30 a.m., the victim's husband called her and asked if the defendant was still there. The victim answered in the affirmative. The victim and the defendant then began to "play fight" with each other, which involved the victim spitting soda and water on the defendant, the defendant attempting to retaliate, and both running around the residence as they did so. The victim's husband called a second time and asked if the defendant was still there. The victim lied and stated that he had left. She then noticed that the floor near the bathroom was sticky from spilled soda and proceeded to mop up the spill. She then went into the bathroom and changed into her pajamas, which consisted of baggy cargo pants, a blue tank top, and no underwear.

The defendant said that he and the victim should have sex and that he would not tell her husband. The

---

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

victim told the defendant no, that she was married and would not have sex with him. She then asked the defendant to leave her residence. The defendant told her that he would not leave until he "got some" and came toward the victim. She ran toward her bedroom where she planned to lock herself in to prevent the defendant's advances, but on her way she slipped on the floor that she had just cleaned. The defendant grabbed her as she fell and pushed her into the bedroom. He then threw her onto the bed and jumped on top of her between her legs. The victim tried to push the defendant away with her feet and kicked the defendant. The defendant continued in his attempt to spread her legs apart as the victim struggled and screamed for the defendant not to continue. The defendant told her to shut up or he would punch her in the face.

The defendant then pulled her pants down, removed his shirt and pushed his pants down to his ankles, leaving his sneakers on. He then placed the victim's legs over his shoulders and had sexual intercourse with her for five minutes, during which he told her to be quiet or he would punch her in the face. The victim said it was impossible to fight the defendant in the position she was in. After the intercourse, the defendant threatened that if she told anyone, he would inform her husband that the sex was consensual and that she had slept with an old roommate. The victim was distraught and upset after the sexual assault.

Once the defendant left, the victim contacted her father, the police and her husband informing them of the sexual assault. She was taken to a hospital where routine tests after a sexual assault were given and evidence taken. Her injuries included abdominal pain, back pain, bruising on her inner thighs and vaginal bleeding. Laboratory tests from specimens taken from the victim

and compared with a blood sample from the defendant indicated that his sperm was present.[3]

## I

The defendant's first claim is that the court improperly denied him his sixth amendment right to confront the victim when it precluded him from questioning the victim about her motive to accuse him falsely of sexual assault.[4] Specifically, the defendant argues that he should have been permitted to cross-examine the victim concerning the reasons for a previous suicide attempt that occurred after she engaged in an earlier extramarital affair. Additionally, the defendant argues that this evidence was admissible under common-law evidentiary rules. We disagree that the court acted improperly.

On May 3, 2002, the defendant filed notice that he intended to offer evidence of the sexual conduct of the victim. On May 6, 2002, the defendant filed a written offer of proof concerning the admissibility of evidence of the victim's sexual conduct, arguing, inter alia, that such evidence was relevant to his defense of consent. On May 9, 2002, the court held a hearing on those matters pursuant to General Statutes § 54-86f. The defendant had subpoenaed medical records from Lawrence and Memorial Hospital in New London concerning the victim. Pursuant to the procedure set forth in

[3] Laboratory tests also indicated the presence of semen from an unidentified person who was not the victim's husband.

[4] The defendant also claims a violation of his rights under article first, § 8, of the constitution of Connecticut. "Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitution. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 69 Conn. App. 649, 656 n.6, 796 A.2d 1225, cert. denied, 260 Conn. 937, 802 A.2d 91 (2002).

*State* v. *D'Ambrosio*, 212 Conn. 50, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990), the court conducted an in camera inspection of all the subpoenaed records and disclosed to the defendant certain medical records from the victim's hospitalization in October, 2000, after a suicide attempt that had been made soon after a previous extramarital affair.[5]

Upon review of those records, the defendant amended his offer of proof concerning the admissibility of evidence of the victim's sexual conduct. The defendant argued that the recently disclosed evidence was relevant to demonstrate that the victim had fabricated the sexual assault claim because she was afraid of her husband's reaction and potential negative effects stemming from her actions.[6] The court deferred ruling on

---

[5] The defendant requests that we conduct an in camera review of all the subpoenaed records to determine if other documents should be disclosed. The defendant, however, provides no case law or analysis of this claim in his brief. Nor does the defendant inform this court of what material is being sought from an in camera review. Additionally, there was no showing that "there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness." (Internal quotation marks omitted.) *State* v. *D'Ambrosio*, supra, 212 Conn. 58. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) *State* v. *Pulaski*, 71 Conn. App. 497, 499 n.4, 802 A.2d 233 (2002). Because the defendant's brief is inadequate, we deem his request for an in camera review waived.

[6] The specific argument made by defense counsel was the following: "[W]ith respect to the information that I just got, there was an incident of infidelity, which led to a suicide attempt and a physician's emergency commitment. And from the defendant's point of view . . . what . . . we must do is to illustrate for the jury's perspective the fact that from his perspective this is a parallel situation. In other words, at a point in time not too terribly far removed from this incident here, there was an act of infidelity. It was revealed. It led to difficulties. The victim attempted to take her own life, went to the hospital, went to another hospital and then subsequently returned to her family. Our position . . . is that that forms the basis for her reporting nonconsensual activity, and unless we are allowed to put that information to the jury, we cannot present that defense."

the defendant's motion until the victim testified. After the victim's direct examination, the defendant renewed his motion to admit the evidence, stating: "I wish to ask her directly concerning whether or not she lied to her husband [during the second telephone call] because she had been previously caught in an affair, and she was worried about the further effect and erosion of her marriage in addition to or rather following on from the October-September hospital records." The state objected to that area of inquiry. The court then asked the defendant's counsel: "Now, this is lying to her husband with respect to saying that your client had left the apartment when, in fact, he was still there? Is that what we're talking about, that phone call." The defendant answered, "Yes, Your Honor." The court overruled the state's objection and permitted that inquiry by the defendant.

The defendant also sought to inquire about the suicide attempt, which had followed the victim's extramarital affair. The defendant argued that this evidence was relevant "[i]f . . . she told the doctor [that] she was found in an illicit affair. She had problems with her husband. That was sufficient in her mind to produce a suicide attempt. We are now six months later. She's in a similar situation. Her husband calls, and now she chooses to lie as opposed to commit suicide, again." The court ruled that such evidence was overly prejudicial and that the probative value of such evidence was outweighed by the potential for unfair prejudice. The defendant then stated: "So, my question, then, is limited to motivation for lying to her husband. That's fine, Your Honor."

On cross-examination, the defendant asked the victim if she had had an extramarital affair in October, 2000, and whether her husband became aware of it. The victim answered in the affirmative to both questions. The defendant also asked the victim if that affair

and her husband's knowledge of the infidelity was the reason she lied about the defendant's presence during the second telephone call on the night of the assault. The defendant did not attempt to introduce the evidence of the victim's suicide attempt, nor did he attempt to introduce or make an offer of proof that portions of the medical records, which related to some of the underlying causes leading to the victim's suicide attempt and which related to her previous infidelity, should be admitted into evidence separately from any reference to the suicide attempt.

At the outset, we note that the defendant's constitutional claim was not preserved at trial.[7] The defendant, therefore, seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] Because the record is adequate for review and the defendant's claim is one of constitutional magnitude, we will review the claim. See *State* v. *Crosby*, 34 Conn. App. 261, 274, 641 A.2d 406, cert. denied, 230 Conn. 903, 644 A.2d 916 (1994).

"The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and

---

[7] The defendant argues that his claim was preserved because he informed the court that the exclusion of the prior sexual conduct of the victim violated his constitutional rights to cross-examination and confrontation. That argument, however, concerned the admissibility of evidence of the victim's prior sexual conduct with three other individuals and was not in reference to the victim's suicide attempt or the October, 2000 infidelity.

[8] An unpreserved claim is reviewable under *Golding* "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Cruz*, 71 Conn. App. 190, 197–98, 800 A.2d 1243, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

"This right, however, is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The trial court, in its discretion, may impose limitations on the scope of cross-examination, as long as the defendant has been permitted sufficient cross-examination to satisfy constitutional requirements. . . . The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited and the right to cross-examine is subject to the duty of the court to exclude irrelevant evidence." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 665, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002). "[T]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has

been an abuse of discretion. . . . If the constitutional standard has been met, then we must nonetheless examine whether the court abused its discretion in restricting the defendant's cross examination of the victim." (Internal quotation marks omitted.) *State* v. *Gainey*, 76 Conn. App. 155, 163, 818 A.2d 859 (2003).

Here, the defendant argues that the court improperly restricted the cross-examination of the victim by not allowing inquiry concerning the victim's suicide attempt and its underlying causes. According to the defendant, the disclosed medical records reveal that the victim attempted to take her life solely because she was distraught when her husband discovered her affair and was afraid that her husband might divorce her and engage in a custody battle for their child. This evidence, the defendant contends, demonstrates a motive by the victim to fabricate the sexual assault claim. Our review of the disclosed medical records, however, reveals that there were numerous reasons underlying the victim's suicide attempt apart from the affair and her fears of her husband's negative reaction.

Although some portions of the disclosed medical records may have been relevant to a motive to fabricate the sexual assault claim, the defendant never made an offer of proof or attempted to introduce those potentially relevant portions separately from the evidence of the victim's suicide attempt. There is no indication that the court would have precluded that area of inquiry. The court simply precluded reference to the suicide attempt and made no ruling that would preclude the defendant from inquiring about the victim's fears stemming from her husband's discovering her previous infidelity. "[A] defendant's right [of cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made." (Internal quotation marks

omitted.) *State* v. *Webb*, 75 Conn. App. 447, 465, 817 A.2d 122, cert. denied, 263 Conn. 919, 822 A.2d 244 (2003).

The defendant was allowed to question the victim concerning her October, 2000 infidelity, her husband's awareness of the affair and her husband's jealousy. The defendant never attempted to ask the victim about her fear of divorce or a custody battle. In addition, the defendant extensively cross-examined the victim about the sexual assault, including the inconsistencies between their respective versions of the events and how the victim's version of events actually demonstrated that the sex was consensual. The defendant did not attempt to ask the victim if she fabricated the claim that the sex was forced because she was afraid of her husband's reaction. There is no indication that the court would have precluded this area of inquiry. The court did not impose any limitations on the defendant's cross-examination of the victim concerning a possible motive to fabricate the sexual assault other than precluding any reference to the suicide attempt. Accordingly, we find that the defendant's constitutional rights to confrontation and cross-examination were not violated.

Because we conclude that the constitutional standard has been met, we next must determine, pursuant to *State* v. *Gainey*, supra, 76 Conn. App. 163, whether the court abused its discretion in restricting cross-examination of the victim concerning her suicide attempt. "Our standard of review of a claim that the court improperly limited the cross-examination of a witness is one of abuse of discretion. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn.

App. 1, 20, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003).

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003).

Here, the court excluded reference to the suicide attempt because its prejudicial impact outweighed any probative value. Clearly, evidence of a suicide attempt would unduly evoke the jury's emotions and sympathy. The victim's suicide attempt implicated her deepest personal and private thoughts and emotions, many of which were irrelevant to the issues at trial. We conclude, therefore, that the court did not abuse its discretion in precluding reference to the suicide attempt. Accordingly, the defendant's claim fails under the third prong of *Golding*.

The defendant also claims that exclusion of any reference to the suicide attempt violated our rules of evidence. This determination is tied inextricably into our prior analysis in our resolution of the defendant's *Golding* claim. The defendant's claim fails because, as we concluded previously, the court did not abuse its discretion in excluding this evidence as being overly prejudicial.

## II

The defendant's second claim is that pursuant to *Doyle* v. *Ohio*, supra, 426 U.S. 610, the state violated

his constitutional rights by using his postarrest and post-*Miranda* silence for impeachment purposes and as substantive evidence of guilt. We disagree.

Additional facts are necessary for the analysis of the defendant's claim. On April 24, 2001, David Anthony Gigliotti, a detective with the New London police department, interviewed the defendant about the victim's allegation of sexual assault. At that meeting, the defendant was not in custody or under arrest and, therefore, was not provided with *Miranda* warnings. The defendant informed Gigliotti that he was not at the victim's residence on April 23, 2001, and he denied having had any type of sexual relationship with her. The defendant also provided a written statement to Gigliotti stating the same. On June 8, 2001, the defendant was arraigned following his arrest, at which time he was informed of his *Miranda* rights. On September 24, 2001, a blood sample was taken from the defendant with Gigliotti present. No interrogation or statements were taken from the defendant at that time.

The defendant alleges that the state committed three *Doyle* violations. First, the defendant references the following question and answer during the state's examination of Gigliotti:

"Q. Detective, at any point after April 24, 2001, when you took the statement . . . from [the defendant] did he have any further conversations with you concerning his activities on the evening of April 23, morning of April 24, 2001?

"A. No, he did not."

The second alleged *Doyle* violation also arose in the state's direct examination of Gigliotti:

"Q. Did [the defendant] tell you about any physical ailments or conditions that he might have been suffering from [on April 24, 2001]?

"A. No, he did not."

The final alleged *Doyle* violation occurred during the state's cross-examination of the defendant:

"Q. When did you claim that this sexual intercourse with [the victim] was voluntary? You never told that to the police, did you?

"A. I believed that ever since the beginning. Police never asked me. No, sir.

"Q. And if they didn't ask you, you weren't going to tell them.

"A. If they would ask, I would've told them."

We note at the outset that the defendant did not properly preserve this claim. He therefore seeks *Golding* review. We review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Cabral*, 75 Conn. App. 304, 311–12, 815 A.2d 1234, cert. granted on other grounds, 264 Conn. 914, 826 A.2d 1158 (2003).

Pursuant to *Doyle*, "evidence of a defendant's postarrest and post-*Miranda* silence is constitutionally impermissible under the due process clause of the fourteenth amendment. . . . The factual predicate of a claimed *Doyle* violation is the use by the state of a defendant's postarrest and post-*Miranda* silence either for impeachment or as affirmative proof of his guilt. . . . The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Kuranko*, 71 Conn. App. 703, 709, 803 A.2d 383 (2002). "Silence following *Miranda* warnings is insolubly ambiguous because it may be nothing more than a defendant's exercise of his or her

*Miranda* rights. . . . Once the government assures a defendant through the issuance of *Miranda* warnings that his silence will not be used against him, it is fundamentally unfair for the state to break that promise by using his silence against him at trial. . . . Comments by the state on a defendant's silence following *Miranda* warnings are not only constitutionally impermissible, but also inadmissible under the principles of evidence." (Internal quotation marks omitted.) *State* v. *Rose*, 41 Conn. App. 701, 711, 679 A.2d 19, cert. denied, 239 Conn. 906, 682 A.2d 1011 (1996).

We conclude that the state did not violate *Doyle* in its questions to Gigliotti. The first question merely referenced the investigative efforts of the police, which does not constitute a *Doyle* violation. See *State* v. *Smith*, 42 Conn. App. 41, 48, 680 A.2d 1340 (1996) ("state may present evidence to show the investigative effort made by the police and the sequence of events as they unfolded"). The second question posed to Gigliotti did not violate *Doyle* because it referenced the defendant's pre-*Miranda* silence. See *State* v. *Esposito*, 223 Conn. 299, 319, 613 A.2d 242 (1992) ("prosecution's use of silence prior to the receipt of *Miranda* warnings does not violate due process").

Assuming without deciding that the state violated *Doyle* in its question posed to the defendant, we conclude that any impropriety was harmless beyond a reasonable doubt. "*Doyle* violations are . . . subject to harmless error analysis. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . [B]efore a . . . constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . . The state bears the burden of

demonstrating that the constitutional error was harmless beyond a reasonable doubt. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's postarrest silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases wherein the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) *State* v. *Kuranko*, supra, 71 Conn. App. 711–12.

Here, there was substantial evidence supporting the defendant's guilt, including (1) the presence of his semen in the victim, (2) his lying to the police in his April 24, 2001 statement, (3) the victim's immediate reporting of the incident to the police, her father and her husband even though the defendant threatened to tell them all that the sex was consensual if she reported the assault, (4) the fact that the defendant could not fully undress during sex, (5) the defendant's threats of physical harm to the victim during the assault, (6) the victim's physical injuries including bruising and vaginal bleeding, (7) the victim's hysterical reaction immediately after the assault, (8) the fact that the victim testi-

fied that if the sex were consensual, she would have used contraceptives to prevent pregnancy, which did not occur here, and (9) the victim's resistance to the defendant's sexual assault.

Furthermore, any potential *Doyle* violation was isolated. There were no repetitive references to the defendant's silence, constant reemphasis on the defendant's silence in closing argument or extensive, strongly worded argument suggesting a connection between the defendant's silence and his guilt. Accordingly, we conclude that any potential *Doyle* violation was harmless.

### III

The defendant's final claim is that the state engaged in prosecutorial misconduct when it improperly asked the defendant to comment on the credibility of the victim's testimony. We agree that in a certain context these questions may be viewed as improper, but, in the context of which they were asked here and considering the trial as a whole, we conclude that the defendant was not denied due process of law.

The defendant cites the following excerpts from the state's cross-examination of him:[9]

---

[9] The defendant also claims on appeal that the following additional questions were improper. We conclude, however, that these questions and answers do not ask the defendant to comment on the veracity or credibility of the victim or her testimony.

"Q. And isn't it a fact that only after . . . your sperm were found in . . . in the sample that was taken from [the victim's] vagina, then and only then did you change your story and claim that this was consensual act of sexual intercourse?

"A. No, sir.

"Q. That's not true?

"Q. No, sir. I spoke with my lawyer about it before then.
* * *

"Q. And you want this jury to believe that what you're testifying to, today, despite those prior lies that you've made in connection with this allegation, that what you're testifying to, today, is the truth, right?

"A. This is the honest truth. Correct.
* * *

"Q. And . . . you wanted the jury to believe from your earlier testimony,

"Q. You heard [the victim] tell the ladies and gentlemen of this jury that as far as she knew, you didn't even know her last name on April 23rd. Is that correct?

"A. I believe that's what I heard.

"Q. Is that correct?

"A. I knew her last name. She'd been over there several times at the house at 262.

\* \* \*

"Q. You heard [the victim] say that you appeared upset when she answered the door. Do you recall that testimony?

"A. I recall her saying that. Yes, sir.

"Q. Was that accurate?

"A. No, sir.

"Q. You weren't upset?

"A. No, sir.

\* \* \*

"Q. You heard [the victim] testify that the music she put was, I think, Eminem.·

"A. That would be rap. I know the difference between rap and light rock, sir.

"Q. Was that accurate? Is that the music she put on?

"A. No, sir. That is not true.

---

that at the time you were arrested, you only weighed 150 pounds, and you've gained thirty pounds, and you now weigh thirty pounds more than you did back in 2001?

"A. When they arrested me, they logged me in at 151 at Corrigan Correctional Institute. I had told the police officers that I thought I weighed 180 to 185 at the New London police department."

* * *

"Q. You heard [the victim] testify that you never took your shoes off. Is that true?

"A. I did take my shoes off, sir.

* * *

"Q. You heard [the victim] say that that you told her that you had torn your shirt wrestling.

"A. Yes, sir.

"Q. Okay. And was that accurate or not? Is that how, in fact you tore your shirt?

"A. I didn't tear it wrestling. No, sir."

Because the defendant failed to object to the claimed prosecutorial misconduct at trial, he seeks review under *Golding*. Because the record is adequate for review and a claim of prosecutorial misconduct is of constitutional magnitude, we will review the defendant's claim. See *State* v. *Singh*, 259 Conn. 693, 699, 793 A.2d 226 (2002).

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State* v. *Moody*, 77 Conn. App. 197, 209, 822 A.2d 990, cert. denied, 264 Conn. 918, 827 A.2d 707 (2003).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail under *Golding*] whe[n] the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161–62, 836 A.2d 224 (2003).

In making that determination, we focus on several factors, including "(1) the extent to which the misconduct was invited by defense conduct or argument, (2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case." *State* v. *Cruz*, supra, 71 Conn. App. 205–206. "Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, supra, 264 Conn. 165.

It is well established that it is improper to ask a witness to comment on another witness' credibility or the veracity of his or her testimony. See *State* v. *Singh*, supra, 259 Conn. 706. "That is because such questions not only invade the province of the jury, in that determinations of credibility are for the jury to decide, but

those questions also have no probative value because they are not helpful to the jury in assessing witnesses' credibility." *State* v. *Dubose*, 75 Conn. App. 163, 179, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003).

As a general proposition, the challenged questions appear to be improper because the defendant was asked to comment on the veracity of another witness' testimony. Our determination, however, focuses on whether any impropriety denied the defendant a fair trial. We therefore must analyze whether this cross-examination rendered the trial so unfair as to make the resulting conviction a denial of due process utilizing the previously mentioned factors.

Here, any misconduct was neither severe nor frequent. The challenged exchanges amounted to only five instances in an extensive cross-examination of the defendant. They related to minor inconsistencies between the defendant's and the victim's recollections of the events of the night in question. They did not attack the major theme of the consent defense, but merely highlighted the differences in the defendant's and the victim's stories. In addition, the state did not ask the defendant to characterize the victim as a liar or to use other strong terms in reference to her testimony. Our conclusion that any misconduct was not severe is highlighted by the fact that no objection or curative instructions were sought by the defendant at trial.

Furthermore, as discussed in part II, the state had substantial evidence supporting the defendant's guilt. Finally, we note that any prosecutorial misconduct was not blatantly egregious and did not reveal a pattern of conduct repeated throughout the trial. Accordingly, we conclude that any misconduct was harmless and, there-

fore, the defendant's claim fails under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.